JUDGE PAULEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

15 CV 00662

- - - - - - - - - - - - - - - - - - x

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION, on behalf of its BELLEVUE
HOSPITAL CENTER, COLER MEMORIAL
HOSPITAL, ELMHURST HOSPITAL CENTER,          : 15 Civ.
GOLDWATER MEMORIAL HOSPITAL,
HARLEM HOSPITAL CENTER, JACOBI MEDICAL       :
CENTER, KINGS COUNTY HOSPITAL CENTER,          COMPLAINT
LINCOLN MEDICAL AND MENTAL HEALTH            :
CENTER, METROPOLITAN HOSPITAL CENTER,
NORTH CENTRAL BRONX HOSPITAL,                :
QUEENS HOSPITAL CENTER, and WOODHULL
MEDICAL AND MENTAL HEALTH CENTER,

                              Plaintiff,

                    v.

SYLVIA MATHEWS BURWELL, as Secretary of the      :
United States Department of Health and Human
Services,

                              Defendant.       :

- - - - - - - - - - - - - - - - - - x

RECEIVED
JAN 29 2015
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, New York City Health and Hospitals Corporation ("HHC"), by

its attorneys, Katten Muchin Rosenman LLP, for its complaint herein alleges:

PRELIMINARY STATEMENT

1.   This action seeks relief from an agency decision by which the Secre-

tary would deprive New York City's municipal hospitals of much-needed reim-

bursement to which they are entitled under the Medicare Act. It involves an

illegal and arbitrary "cap" on Medicare cost apportionment as described below.

This unexplained and inexplicable cap, never promulgated as a regulation, was

held invalid as a matter of law in the unanimous and authoritative *County of*

*Los Angeles v. Sullivan*, 969 F.2d 735 (9th Cir. 1992). The Provider Reimburse-

ment Review Board came to the same conclusion in the present case, but the

Secretary reversed.

THE PARTIES

2.   Plaintiff HHC operates the municipal hospital system of the City of New York. Its hospitals annually provide more than a million inpatient days of care, and its outpatient clinics effectively serve as the family doctor for hundreds of thousands of New Yorkers (several million outpatient department and emergency room visits annually). It is the largest municipal health care system in the country, and it is a principal provider of hospital services to New York City's neediest residents, including elderly or disabled individuals covered by the Medicare Program established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (the "Medicare Act").

3.   HHC is a public benefit corporation created by the New York State Legislature in 1969, mandated by its statutory charter to deliver "high quality, dignified and comprehensive care and treatment for the ill and infirm, particularly to those who can least afford such services." It fulfills this mandate in a tradition of health service that is special to New York City, a tradition that dates back to 1736, when the City created its first infirmary to care for the sick who had no other refuge.

4.   Defendant Sylvia Mathews Burwell is the Secretary of the United States Department of Health and Human Services (the "Secretary"), the federal official responsible for the administration of the Medicare Program. The Secretary fulfills this function primarily through a departmental agency, the Centers for Medicare & Medicaid Services ("CMS") (previously the Health Care Financing Administration). The Secretary and CMS are required to, among other things, calculate and pay reimbursement to health care providers for covered

101985288v4

services furnished to Medicare beneficiaries. This activity is commonly carried out by "Fiscal Intermediaries" or "Medicare Administrative Contractors" ("MACs") under contract with the Secretary.

<h2 style="text-align:center">JURISDICTION AND VENUE</h2>

5.   This action arises under the Medicare Act, the Federal Regulations promulgated thereunder, and the Administrative Procedure Act, 5 U.S.C. Ch. 5 & 7.

6.   Jurisdiction is vested in this Court under 42 U.S.C. § 139500(f)(1) (review of a final agency determination) by virtue of the Secretary's determination received by HHC on December 2, 2014 (Exhibit A hereto), reversing a decision by the Provider Reimbursement Review Board (Exhibit B hereto).

7.   Venue lies in this District under 42 U.S.C. § 139500(f)(1), because the Plaintiff is located in this District.

**THE FOLLOWING POINTS ARE STIPULATED,
UNCONTESTED IN THE RECORD,
OR INDISPUTABLE**

The Hospitals' Medicare "Reasonable Cost"
<u>Must Be Apportioned and Reimbursed</u>

8.   The Medicare program was established by Congress in 1965 to provide health insurance for the aged and disabled. For the years at issue here, these HHC Hospitals were entitled to receive Medicare "reasonable cost" reimbursement for certain services. The "reasonable cost" to be reimbursed is defined in the Medicare Act as the "cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A).

3

9. Congress in the Medicare Act required not only that providers be reimbursed for their actual, reasonable costs of providing services to Medicare beneficiaries, but that the Secretary develop methods of determining costs to assure that necessary costs of providing services to Medicare beneficiaries will not be borne by individuals not covered by the Medicare Act. 42 U.S.C. § 1395x(v)(1)(A) (*i.e.*, reasonable cost reimbursement is required, and "cost-shifting" is prohibited); 42 C.F.R. § 413.5(a), (b)(3) (Secretary's implementation of the cost-shifting prohibition); 42 C.F.R. § 413.50 (must apportion allowable costs between Medicare and non-Medicare patients).

10. The Secretary has adopted regulatory methods for determining the portion of a provider's total reasonable costs that will be apportioned to, and reimbursed by, the Medicare program. During the periods at issue, most cost-reimbursed providers were generally required to apportion cost to Medicare based on the ratio of covered beneficiary charges to total patient charges on a departmental basis. This apportionment is possible where the provider has developed and used a detailed charge structure that enables it to record total and program beneficiaries' charges by department.

11. Where providers do not maintain departmental charges, the Secretary has specified a different approach to cost apportionment: Cost Apportionment Methods A through E, set forth in Provider Reimbursement Manual ("PRM") § 2208.1 and .3. (The PRM is issued by the Secretary and contains guidelines for Medicare fiscal intermediaries to use in determining a provider's reimbursement.)

101985288v4

12. These HHC Hospitals were All-Inclusive Rate Providers and did not have departmental charges; rather, they charged a global fee based on the number of days the patient spent in the hospital. (They also billed separate fees for a limited assortment of ancillary services, but not enough to enable them to meet the regulatory requirements for departmental cost apportionment.)

13. The Hospitals apportioned cost to the Medicare Program using Method B, and the Intermediary calculated the Hospitals' Medicare reasonable cost reimbursement using that method.

Cost Apportionment Under Method B Has Been
<u>Limited By an Unexplained "100 percent Cap"</u>

14. The Secretary announced the alternative Methods A through E of cost apportionment for all-inclusive rate providers in Intermediary Letter No. 321 (Apr. 1968).

15. These Methods A through E are presented "in the order of their preference," and hospitals were obligated to use Method A if their recordkeeping and data were sophisticated and detailed enough to allow it, or Method B if their recordkeeping and data were less sophisticated, then C, and so forth. PRM § 2208.1.

16. Intermediary Letter 321 provides that the Method B reimbursement methodology relies on two premises: (1) that patients generally receive more ancillary services in the early stages of their hospitalization, and, therefore, higher costs are incurred in the early days of each patient stay; and (2) that aged patients remain hospitalized over longer periods but require less ancillary services over the latter part of the hospital stay.

17. Providers' reimbursement under the original Method B accordingly varies depending on the ratio of the Average Length Of Stay for Medicare beneficiaries to the ALOS of all inpatients:

    (a) Where the ALOS for Medicare patients is longer than the ALOS for all inpatients, the program pays providers less than all-inpatient average per diem ancillary cost.

    (b) Where the ALOS for Medicare patients is shorter than for all inpatients, the program under the original Method B would pay more than the all-inpatient average per diem ancillary cost.

18. The Secretary added the so-called "100 percent cap" provisions to Method B in 1971, by Intermediary Letter No. 71-25, later incorporated in PRM § 2208.1 and .3.

19. The 100 percent cap limits Medicare reimbursement to no more than the average per diem ancillary cost for all inpatients, regardless of average length of stay. Thus, although Method B pays a provider, on the average, less than 100% of its average per diem ancillary costs when its Medicare length of stay is greater than its overall average length of stay, the provider is limited to 100% of its average per diem ancillary costs if its Medicare length of stay is less than its overall average length of stay.

20. The issuance of Intermediary Letter No. 71-25 did not include an explanation of its purpose or rationale.

21. *County of Los Angeles v. Sullivan*, 969 F.2d 735 (9th Cir. 1992), held that the 100 percent cap was unlawful.

22. In the present case, two decades later, discovery proceedings below confirmed that the Intermediary is not aware of any explanation or justification by the Secretary of the 100 percent cap.

6

101985288v4

The Administrative Proceedings Below

23. At the close of each fiscal year at issue, HHC submitted to its Intermediary a Medicare "cost report" for each Hospital. 42 C.F.R. § 413.20. The Intermediary performed audits on each cost report and prepared an annual Notice of Program Reimbursement for each Hospital, setting forth the final determination of the amount of Medicare reimbursement to be paid to each. 42 C.F.R. § 405.1803.

24. The cost apportionment calculations that the Intermediary prepared for the settlement of the cost reports reveal the application of the 100 percent cap to each Hospital for each year at issue. (Exhibit P-4 to HHC's Final Position Paper in the administrative record herein.)

25. The foregoing application of the 100 percent cap reduced the Hospitals' Medicare reimbursement by approximately $15 million.

26. HHC challenged the application of the 100 percent cap by appealing the Hospitals' Notices of Program Reimbursement to the Provider Reimbursement Review Board ("PRRB" or "Board") pursuant to 42 U.S.C. § 139500 and 42 C.F.R § 405.1835.

27. Various HHC appeals on this issue were consolidated for Board review. *See* Board Decision (Ex. B hereto) at p. 9.

28. The parties stipulated that there were no disputed issues of fact and that the PRRB could decide HHC's appeals on a "Record Hearing" under PRRB Rule 32.3.

29. The PRRB's decision (Ex. B hereto) granted the appeals.

101985288v4

30. The CMS Administrator, exercising the Secretary's authority under 42 U.S.C. § 139500(f)(1), reversed the PRRB's decision (Ex. A hereto).

31. The Administrator's ruling constitutes the Secretary's final decision. HHC has exhausted the administrative remedies available to it.

COUNT 1

The Cap Violates the Medicare Act and Regulations

32. Repeats and realleges the allegations contained in paragraphs 1 through 31 hereof.

33. The Secretary's decision regarding the application of the 100 percent cap to the Hospitals (a) denies the Hospitals reimbursement for the reasonable costs of furnishing covered services to Medicare beneficiaries and (b) causes non-Medicare patients to bear the costs of services rendered to Medicare patients, in violation of the Medicare Act and regulations, and is accordingly unlawful and invalid.

34. Application of the 100 percent cap also directly undermines Congress's view, as reflected in the legislative history of the Medicare Act, that the shorter a patient's stay, the greater the ancillary per diem costs incurred in treating the patient, and Congress's intent that Medicare reimbursement principles should reflect this relationship.

35. The Medicare regulations addressing the apportionment of ancillary costs indicate that even the Secretary has rejected reimbursement for ancillary costs on a purely average per diem basis and has recognized that the shorter a patient's length of stay, the greater will be the average ancillary per diem cost incurred in treating such a patient. 42 C.F.R. § 413.50. The 100 percent cap

8

results in a provider being reimbursed on only an average per diem basis for ancillary costs, and is inconsistent with the understanding that patients with a shorter length of stay have a higher ancillary cost per diem, in violation of the cost apportionment regulations.

## COUNT 2

### The Cap Is Arbitrary and Capricious

36. Repeats and realleges the allegations contained in paragraphs 1 through 35 hereof.

37. The Secretary failed to give an explanation for the 100 percent cap in connection with its adoption, and gave no sign that all relevant factors had been considered in adopting the cap.

38. The 100 percent cap is inconsistent with the remainder of PRM § 2208.1(B), which recognizes that patients receive more ancillary services at the beginning of their stay, and that patients who have a shorter length of stay, on an average, incur more ancillary costs per day than other patients.

39. The administrative record reveals that the 100 percent cap is not only unexplained but inexplicable and irrational.

40. The grounds for the Secretary's decision reversing the PRRB and upholding the 100 percent cap do not support that decision.

41. For the foregoing reasons, the 100 percent cap, and/or the Secretary's decision regarding the application of the 100 percent cap to the Hospitals, is arbitrary, capricious, contrary to law, violates the Administrative Procedure Act, and is accordingly unlawful and invalid.

9

101985288v4

## COUNT 3

### The Cap Was Promulgated in Complete
### Disregard Of the APA-Mandated Procedures

42. Repeats and realleges the allegations contained in paragraph 1 through 41 hereof.

43. The Administrative Procedure Act requires, among other things, that rules must be promulgated pursuant to prescribed statutory process. *E.g.*, 5 U.S.C. § 553(b), (c) (notices of proposed rule-making published in the Federal Register, and the public given an opportunity to comment).

44. The addition of the 100 percent cap to the Method B computation is a substantive rule, and it was not lawfully promulgated under the APA: It was announced in Intermediary Letter 71-25 (*supra* ¶ 18), which ignored the APA notice and comment requirements. This addition substantively altered the Method B cost apportionment computation, and it deprived the Hospitals of reimbursement to which they were previously entitled.

45. Because the 100 percent cap is a substantive rule, but not promulgated in accordance with the APA, it is invalid and cannot be enforced.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that,

(1)     This Court declare and adjudge that the Secretary's decision herein was unlawful and invalid;

(2)     This Court enter an Order

(a) reversing or vacating the Secretary's decision;

10

101985288v4

(b) directing the Secretary, through her Intermediary, to recompute the amount of reimbursement owed to HHC under the Medicare Program for the services furnished by the Hospitals for the years at issue herein; and

(c) directing the Secretary to pay the additional reimbursement resulting from the recomputation of HHC's reimbursement without application of the 100 percent cap, together with interest thereon as provided by law.

(3)     Plaintiffs be awarded their costs and such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
         January 29, 2015

                                        KATTEN MUCHIN ROSENMAN LLP

Of Counsel                              By: _____
   David A. Florman                          Joseph V. Willey (JW-8409)

                                        575 Madison Avenue
                                        New York, NY 10022-2585
                                        (212) 940-7087
                                        joseph.willey@kattenlaw.com

                                        Attorneys for Plaintiff

101985288v4