Exhibit A

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

**NOV 2 4 2014**

**CERTIFIED MAIL**

Joseph V. Willey, Esquire
Katten Muchin Zavis Rosenman
575 Madison Avenue
New York, NY 10022

Re:  New York City Health and Hospitals Corporation Improper Application of Weighted
     Discharge Cap CIRP Groups, PRRB Decision No. 2014-D28

Dear Mr. Willey:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board.  This constitutes the final administrative decision of the

Secretary of the Health and Human Services.  Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc:  Arthur E. Peabody, Jr.,  Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

In the case of:

**New York City Health and Hospitals
Corporation Improper Application of
Weighted Discharge Cap CIRP Groups**

**Provider(s)**

vs.

**National Government Services/
BlueCross BlueShield Association.**

**Intermediary**

Claim for:

**Provider Cost Reimbursement
Determination for Cost Years
Ending: Various**

Review of:

**PRRB Dec. No. 2014-D28
Dated: September 24, 2014**

---

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period mandated in § 1878(f)(1) of the Social Security Act (Act), as amended (42 U.S.C. § 1395oo(f)). The parties were notified of the Administrator's intention to review the Board's decision. The Provider commented, requesting that the Board's decision be upheld. The Intermediary and the CMS' Center for Medicare (CM) commented requesting reversal. Accordingly, this case is now before the Administrator for final agency review.

## ISSUE

Whether the Intermediary properly applied the weighted discharge cap to the Providers' ancillary costs?

## BOARD'S DECISION

The Board concluded that it was improper for the Intermediary to apply the weighted discharge cap (i.e., the 100 percent cap) to the Providers' ancillary costs. The Board

concluded that Provider Reimbursement Manual (PRM) §2208.1, Methods A through E cost apportionment methodologies were interpretive guidance to implement the cost apportionment principles in 42 C.F.R. §413.50 as it relates to preventing cost shifting between Medicare and non-Medicare patients in determining cost of service for Medicare beneficiaries in hospitals with an all-inclusive or no-charge structure. Moreover, the Board concluded that Methods B through E were designed to be temporary and never intended to be permanent. Because of these larger principles, the implementation of the 100 percent cap under the facts of this case was improper.

## SUMMARY OF COMMENTS

The CM commented requesting that the Board's decision be reversed stating that an all-inclusive provider receives Medicare Reimbursement of ancillary costs by apportioning allowable costs between Medicare and non-Medicare patients using one of the five alternative cost apportionment methods, (Method A, B, C, D, or E) in the PRM at §2208.1. CM noted that providers select the method based upon the provider's recordkeeping practices and data available to perform the required allocation computations. The Providers selected Method B. The limitation under Method B is referred to as the 100 percent cap. CM disagreed with the Providers that Method B violates reasonable cost reimbursement principles, because without the 100 percent cap, Medicare could generally unfairly reimburse a Provider for ancillary costs greater than the Medicare share. Method B is based on the premise that generally aged patients remain hospitalized longer but require less ancillary services over the latter part of their hospital stay. CM commented that in order to ensure that the average per diem ancillary costs are apportioned appropriately among Medicare and non-Medicare patients, *Medicare limits reimbursement for Providers as generally the average length of a hospital stay (ALOS) is shorter for Medicare patients that the ALOS for all patients.*

Moreover, CM commented that Providers were free to change their charge structure and recordkeeping practices, but chose not to change their charge structure or recordkeeping practice. The Board itself acknowledged that Methods B through E were designed to be temporary, and not a permanent method of calculating apportionment costs for all-inclusive or no-charge structure hospitals. For cost-reporting periods ending after December 31, 1969, the Providers should have adapted to statistical Method A as its permanent method of cost apportionment. The Providers' modification of the 100 percent cap portion of Method B, when the Providers' ALOS for Medicare patients was shorter than its ALOS for all patients, is not permitted. Medicare policy does not permit providers to ignore Medicare rules and utilize a portion of the Method B apportionment methodology and to reject the cap portion of Method B.

The Providers commented, requesting that the Board's decision be affirmed and stated that the 100 percent cap that limits Method B cost apportionment as described in the PRM

§2208.1 was invalidated by the Ninth Circuit Court of Appeals.[1] The Provider stated that the Method B of cost apportionment for all-inclusive rate providers was first announced in 1968 and did not contain the 100 percent cap. The Providers' reimbursement varied depending on the ratio of the ALOS for Medicare beneficiaries and the ALOS for all inpatients. The Providers commented that if Medicare beneficiaries' ALOS was longer than all inpatients', the Medicare program paid lower average per diem ancillary services costs and, conversely, if Medicare beneficiaries' ALOS was shorter than all inpatients,' the program paid higher average per diem ancillary costs. Under either scenario, method B provided for equitable reimbursement. The Providers commented that the Secretary added the 100 percent cap provisions to Method B in 1971, without any explanation. The Providers commented that the 100 percent cap is unlawful and invalid because it violates the Medicare Act, the regulations, is arbitrary and capricious, and was not promulgated in accordance with the Administrative Procedure Act. The Providers commented that the 100 percent cap should not be applied to deprive the hospitals of reimbursement to which they are entitled as a matter of law.

The Intermediary commented, requesting reversal of the Board's decision, because it failed to give proper deference to the weighted discharge cap that was applied to the Providers' ancillary cost computation and failed to show deference to the agency's reasonable regulations. The Intermediary commented that Congress has afforded the Secretary the authority and discretion to determine the reasonable cost of services and the items to be included in the category of reimbursable costs. In determining reasonable reimbursement, the Intermediary commented, that CMS properly implemented the regulatory mandate to design flexible alternative reimbursement methods for reimbursing ancillary costs of all-inclusive rate providers. The Intermediary noted that the Provider chose Method B, when it could have converted its business model to conform to the requirements of a more sophisticated alternative Method A. The Intermediary noted that Provider chose not to update their recordkeeping methods to Method A.

The Intermediary disagreed with the Board's determination that providers do not have the burden of proof to establish that their actual costs of Medicare patients were higher than that of their non-Medicare patients to have the 100 percent cap removed, and commented that under the Social Security Act, no payments shall be made to any provider unless it has furnished such information as the Secretary may require in order to determine the amount due.[2] The Intermediary stated that CMS has the authority to establish and implement the 100 percent cap and the authority to establish reasonable costs.

---

[1] *County of Los Angeles v. Sullivan*, 969 F.2d 735 (9th Cir. 1992).
[2] 42 U.S.C. 1395g(a).

4

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits.  The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

The Medicare program was established under Title XVIII of the Social Security Act to provide health insurance to eligible individuals. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services charged with administering the Medicare program. CMS' payment and audit functions under the Medicare program were originally contracted to organizations known as fiscal intermediaries and later statutorily to Medicare administrative contractors (MACs).  The Intermediaries and MACs[3] determine payment amounts due the providers under Medicare law, regulation and interpretative guidelines published by CMS.

The Medicare insurance program provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care in accordance with this part for certain individuals. he term "provider of services" means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of sections 1814(g) and 1835(e), a fund. Section 1814(a) states that, except as provided in subsections (d) and (g) and in section 1876, payment for services furnished an individual may be made only to providers of services which are eligible therefor under section 1866 and only if certain criteria are met.  A provider of service is required to submit cost reports annually, with reporting periods based on the provider's accounting period. A cost report shows the costs incurred during the relevant period and the portion of those costs allocated to the Medicare program.[4]  Each intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement (NPR).[5]  A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the receipt of the NPR.[6]

Regarding payment, section 1815(a) of the Social Security Act states that:

---

[3] For purposes of this review, the use of the terms Intermediary and MAC are used interchangeably.
[4] *See* 42 C.F.R. §413.20.
[5] *See* 42 C.F.R. §405.1803.
[6] 42 C.F.R. §405.1835.

> The Secretary shall periodically determine the amount which should be paid
> under this part to each provider of services with respect to the services
> furnished by it, and the provider of services shall be paid, at such time or
> times as the Secretary believes appropriate …, from the Federal Hospital
> Insurance Trust Fund, the amounts so determined, with necessary
> adjustments on account of previously made overpayments or
> underpayments; except that no such payments shall be made to any provider
> unless it has furnished such information as the Secretary may request in
> order to determine the amounts due such provider under this part for the
> period with respect to which the amounts are being paid or any prior period.

Consistent with section 1815(a) of the Social Security Act, the Secretary has implemented a number of Medicare documentation regulations, including those at 42 CFR §§413.9, 413.20 and 413.24, which require, *inter alia*, that a provider furnish contemporaneous, auditable, and verifiable documentation in support a claim for payment.[7]

For the providers at issue in this case for the cost years at issue, the Medicare program reimbursed participating health care providers for the reasonable cost of providing services to beneficiaries. Section 1861(v)(1)(A) of the Social Security Act requires that providers of services to Medicare beneficiaries are to be reimbursed the reasonable cost of those services. Reasonable cost is defined as the "cost actually incurred, excluding there from part of the incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included …" *Id.* This component of Medicare law and policy does not specifically address the determination of reasonable cost, but authorizes the Secretary to promulgate regulations and principles to be applied in determining reasonable costs. One of the underlying principles set forth in the Act is that Medicare shall not pay for costs incurred by non-Medicare beneficiaries, and vice-versa. Medicare prohibits cross-subsidization of costs. These reasonable cost principles are reflected and further explained in the regulations. This includes the anti-cross-subsidization principle which is set forth in various regulatory text. The regulations at 42 C.F.R. §413.9(c) provides that the determination of reasonable cost must be based on costs related to the care of Medicare beneficiaries and defines necessary and proper costs.

The regulation at 42 C.F.R. §413.50 entitled "Apportionment of allowable costs" states that a basic factor bearing upon apportionment of costs is that Medicare beneficiaries are not a cross section of the total population. Available evidence shows that the use of services by persons age 65 and over differs significantly from other groups. Consequently, the objective sought in the determination of the Medicare share of a provider's total costs means that the methods used for apportionment must take into account the differences in

---

[7] The Administrative Procedure Act provides that the proponent of any action has the burden of proof. 5 U.S.C. §556(d).

the amount of services received by patients who are beneficiaries and other patients serviced by the provider. The method that determines the average-per-diem cost does not take into account variations in the amount of service which a day of care may represent and thereby assumes that the patients for whom payment is made on this basis are average in their use of service. In considering the average-per-diem method of apportioning cost for use under the program, the difficulty encountered is that the preponderance of presently available evidence strongly indicates that the over-age 65 patient is not typical from the standpoint of average-per-diem cost. On the average this patient stays in the hospital twice as long and therefore the ancillary services that he uses are averaged over the longer period of time, resulting in an average-per-diem cost for the aged alone, significantly below the average-per-diem for all patients.

Further, the relative use of services by aged patients as compared to other patients differs significantly among institutions. Consequently, considerations of equity among institutions are involved as well as that of effectiveness of the apportionment method under the program in accomplishing the objective of paying each provider fully, but only for services to beneficiaries. In addition, CMS recognized that the relative use of services by aged and other patients can be expected to change, possibly to a significant extent in future years. The ability of apportionment methods used under the program to reflect such change is an element of flexibility which has been regarded as important in the formulation of the cost reimbursement principles.

Under general principle of cost apportionment, total allowable costs of a provider are apportioned between program beneficiaries and other patients so that the share borne by the program is based upon actual services received by program beneficiaries. The most typical method of apportionment is defined as the Departmental Method which is comprised of the ratio of covered beneficiary charges to total patient charges for the services of each ancillary department applied to the cost of the department. (*See., e.g..* section 2200.1 of the PRM.) Charges refer to the regular rates established by the provider for services rendered to both beneficiaries and to other paying patients. Charges should be related consistently to the cost of the services and uniformly applied to all patients whether inpatient or outpatient. All patients' charges used in the development of apportionment ratios should be recorded at the gross value; i.e., charges before the application of allowances and discounts deductions.[8] Relevant to this case, ancillary services in a hospital or SNF include laboratory, radiology, drugs, delivery room (including maternity labor room), operating room (including postanesthesia and postoperative recovery rooms), and therapy services (physical, speech, occupational). Ancillary services may also include other special items and services for which charges are customarily made in addition to a routine service charge.[9]

---

[8]   Section 2202.4 of the PRM.
[9]   *See e.g.* PRM section 2202.8.

The general reasonable cost regulation was originally promulgated on November 22, 1966 by the Social Security Administration (SSA), which was the agency then responsible for administering the Medicare Program.[10]  In April 1968, the Bureau of Health Insurance (BHI), which was the Bureau within SSA that was then responsible for administering the Medicare program, issued Intermediary Letter No. 321 (IL 321) entitled "Determining Cost of Service for Medicare Beneficiaries in Hospitals with All-Inclusive or No-Charge Structure Temporary Alternative Methods Available for Medicare Cost Reporting Periods Ending Before January 1, 1969" which laid out five alternative cost apportionment methods- Methods A through E. As initially announced in this IL, Method B did not contain a cap that limits cost apportionment where the "average length of stay" for Medicare inpatients is less than the average length of stay" for all inpatients.

In October 1971, BHI added a 100 percent cap provision to Method B through the issuance of Intermediary Letter No. 71-25, which states in pertinent part:

> The purpose of this supplement is to offer clarification of the formulae for determining Medicare reimbursement as set forth in IL 321 under Method B (Sliding Scale) .... Several situations have come to our attention which indicates the need for such clarification.

> Method B-Sliding Scale Method

> The Sliding Scale Method is used to arrive at a percentage of ancillary average per diem costs as a basis for Medicare reimbursement for ancillary services. This percentage can be less than, but cannot exceed, 100 percent of the average ancillary per diem cost. Where the average length of stay for Medicare inpatients is less than the average length of stay for all inpatients, the percentage that would be derived under the formula authorized by IL 321 would be 100 percent.

The SSA published proposed regulations at 36 Fed Reg. 22987 (December 2, 1971) and final rules at 37 Fed. Reg. 10353 (May 20, 1972) on the reasonable cost apportionment methods at 42 CFR 405.404(5) and provided temporary methods of apportionment for cost reporting periods ending before January 1, 1969. However, this method (based on charges) may not be used by hospitals which have all-inclusive rates or no charge structures. In addition, the regulation provided that: "Methods for providers having all-

---

[10] 42 C.F.R. §413.50 was originally codified at 20 C.F.R. §405.403 in 1966 and then recodified at 42 C.F.R. § 405.403 in 1977 before it was recodified to its present location in 1986.  See 31 Fed. Reg. 14,808, 14,809-14810 (Nov. 22, 1966); 42 Fed. Reg. 52,826 (Sept. 30, 1977); 51 Fed. Reg. 34,790 (Sept. 30, 1986).

inclusive rates or no-charge structures will be developed by the Social Security Administration."

Consistent with the text for the final rule for 42 CFR 405.404, in June 1976, the Provider Reimbursement Manual, (PRM 15-1) added section 2208.[11] Section 2208.1 of the PRM explains cost finding for "All-Inclusive Rate or No-Charge Structure Hospitals." The approved methods for apportioning allowable cost between Medicare and non-Medicare patients under the program are not readily adaptable to those hospitals having an all-inclusive rate (one charge covering all services) or a no-charge structure. Therefore, alternative methods of apportionment were developed for all-inclusive rate or no-charge structure hospitals. These methods are available only to those hospitals which do not have charge structures for individual services rendered. The alternative methods described in section 2208.1 are presented in the order of their preference, A through E For cost reporting periods ending after December 31, 1969, the statistical method (Method A) shall be considered the permanent method of cost apportionment. Notably. where the permanent method is not used, the Guidance specifies that: "The intermediary may grant specific permission for a hospital to continue to use--on a temporary basis--a less sophisticated method." (Emphasis added.) As a result, the Method B instructions are laid out in § 2208.1 (B) as follows:

> B. <u>Sliding Scale - Method B</u>.-In the absence of charges or statistical data, a hospital may use the sliding scale method to determine ancillary costs, with routine service costs determined on an average per diem cost basis. Total allowable costs should be allocated between routine and ancillary services through step-down cost finding, or by using the estimated percentage basis where permitted. When using the sliding scale method to determine Medicare ancillary costs, the hospital would:
> 1.      determine the average length of stay of all patients;
> 2.      determine the average length of stay for patients 65 years or older;
> 3.      calculate the. average per diem allowable ancillary costs for all patients;
> 4. determine the weighted average percentage of average per diem ancillary costs for Medicare patient in the following manner:
> a. multiply the average length of stay for all patients by 100 percent to determine a weighted percentage;
> b. the difference in the number of days between the average length of stay for patients 65 years or older and the average length of stay for all patients must be multiplied by 75 percent to determine a weighted percentage;
> c. the total of a. and b. above will produce a total weighted value for the average length of stay for patients 65 years or older.

---

[11] *See* PRM 15-1, Transmittal 155 (June 1976).

This weighted value must be divided by the average length of stay for patients 65 years or older to produce the percentage to be applied to the ancillary average per diem cost.

This percentage can be less than, but cannot exceed. 100 percent of the average ancillary per diem cost. Where the length of stay for Medicare inpatients is less than the average length of stay for all inpatients, the percentage derived under this formula would be 100 percent. [12]

This case is a consolidated appeal involving three groups. The Providers are located in the State of New York. The cost reporting periods at issue are for fiscal years 1999 through 2007. The Providers are generally psychiatric and rehabilitative sub-units that use an all-inclusive rate charge structure and, therefore, do not have departmental charges that would allow the apportionment of costs based on charges. For purposes of cost apportionment, the Providers apportioned costs pursuant to the instructions for Method B under section 2208 of the PRM.

Under Method B, the Secretary limits the amount of Medicare reimbursement to the 100 percent of all inpatients' average per diem ancillary cost. The Intermediary issued NPRs for the Providers' cost reporting periods at issue and capped the weighted discharge value at 100 percent for Providers' (e.g., psychiatric and rehabilitation units/providers). In certain units, the ALOS for Medicare patients was shorter than the ALOS for all inpatients, which caused the Provider to claim that it should be paid without the application of the 100 percent cap for the affected units. [13]

The Administrator finds that under the Act, CMS has the authority to establish and implement the 100 percent cap under Method B and the authority to establish reasonable cost rules. In determining reasonable cost reimbursement CMS properly instituted flexible alternative reimbursement methods for reimbursing ancillary costs of all-inclusive rate providers. In this instance, the §2208 Method B is longstanding policy put in place in 1976, pursuant to the regulatory pronouncement in the 1972 final rule. It is within the CMS authority to promulgate policy and guidance pursuant to interpretative manuals such as the PRM. The cost years in this case involve 1999 through 2007, and thus involve cost years from more than 20 to 30 years after the promulgation of section 2208 Method B of the PRM. The Board erroneously concluded that the language stating that Method B was "temporary" meant that CMS was under an obligation to implement other methods. However, that language is referring to the fact that providers are affirmatively expected to

---

[12] *See, e.g.,* Provider Exhibit P-3 (Case No. 11-0568GC).

[13] The record shows that for many of the providers/provider sub-units, some of the distinct units paid under reasonable costs showed the Medicare ALOS longer that the Non-Medicare ALOS and the issue of the use of §2208 Method B was not appealed for those sub-units/providers..

move to more sophisticated methods in lieu of Methods B through E.   The Providers have the burden to use a more sophisticated method of apportioning costs to establish that their actual costs of Medicare patients is higher than that calculated under Method B. Neither the regulation, nor the PRM allows for the further hybridization of apportionment methods or exceptions to the necessary documentation to support costs under section 1815, 42 CFR 413.20, 413.24 and section 2208.

The Providers were on notice regarding the application of the Method B 100 percent cap, which had been in place in the PRM since 1976. The Provider chose not to change their charge structure and recordkeeping practices. The Administrator finds that for the cost-reporting periods at issue in this case, could have Providers have adapted to the statistical Method A as their permanent method of cost apportionment. The Providers in this case did not demonstrate through the selection of a more sophisticated Method A that they were entitled to additional cost-reimbursement.[14] Therefore, the Administrator finds that Intermediary properly applied the weighted discharge cap to the Providers' ancillary costs and the Board decision is reversed.

---

[14] The *County of Los Angeles v. Sullivan*, 969 F.2d 735 (9th Cir. 1992), was adverse to the government. However, the *County of Los Angeles* case involved cost-reporting years from 1980 and is not controlling law in the judicial venue in which the Providers are may file suit.

## DECISION

The decision of the Board is reversed consistent with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE
SECRETARY OF HEALTH AND HUMAN SERVICES

Date: 11/20/14

Marilyn Tavenner
Administrator
Centers for Medicare & Medicaid Services



CERTIFIED MAIL

7012 2920 0002 5171 9020

Received
Dec 2, 2014    19:30

Office/Bldg

Deliver To
(Floor / Room)

Aronson, Berna... ((212) 940-7018)
(Willey, Joseph ((212) 940-7087))
Sender
DEPT. OF H... (FOR MED...)

INB0283511

Signature Required

JOSEPH V WILLEY ESQUIRE
KATTEN MUCHIN ZAVIS ROSENMAN
575 MADISON AVE
NEW YORK NY 10022

DEPARTMENT OF
HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 SECURITY BLVD
BALTIMORE MD 21244-1850

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

English          Customer Service          USPS Mobile                                              Register / Sign In

**≋USPS.COM**                                                    Search or Enter a Tracking Number

Quick Tools

Mail & Ship          Track & Manage          Postal Store          Business          International          Help

USPS Tracking™                                    ✉ Customer Service ›
                                                      Have questions? We're here to help.

Tracking Number: 70122920000251719020

Updated Delivery Day: Tuesday, December 2, 2014

Product & Tracking Information                              Available Actions

Postal Product:              Features:                       Return Receipt After Mailing
                             Certified Mail™

DATE & TIME                  STATUS OF ITEM          LOCATION

**December 2, 2014 , 2:21 pm    Delivered               NEW YORK, NY 10022**

Your item was delivered at 2:21 pm on December 2, 2014 in NEW YORK, NY 10022.

December 2, 2014 , 9:08 am   Out for Delivery        NEW YORK, NY 10022

December 2, 2014 , 8:58 am   Sorting Complete        NEW YORK, NY 10022

December 1, 2014 , 3:22 pm   Arrived at Unit         NEW YORK, NY 10022

November 26, 2014 , 2:12     Departed USPS Facility  NEW YORK, NY 10199
am

November 25, 2014 , 6:28     Arrived at USPS Facility NEW YORK, NY 10199
pm

November 24, 2014 , 7:49     Arrived at USPS Facility BALTIMORE, MD 21233
pm

Track Another Package

Tracking (or receipt) number

[                                              ]        Track It

HELPFUL LINKS
Contact Us
Site Index
FAQs

ON ABOUT.USPS.COM

About USPS Home
Newsroom
USPS Service Updates
Forms & Publications
Government Services
Careers

OTHER USPS SITES
Business Customer Gateway
Postal Inspectors
Inspector General
Postal Explorer
National Postal Museum
Resources for Developers

LEGAL INFORMATION
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

Copyright © 2015 USPS. All Rights Reserved.

Search or Enter a Tracking Number