Exhibit B



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670

Phone: 410-786-2671
FAX:   410-786-5298

Internet: www.cms.gov/PRRBReview

Refer to: **Case Nos.:** 08-1929GC; 09-0510GC; 11-0568GC
**Decision No.:** 2014-D28

SEP 2 4 2014

**CERTIFIED MAIL**

Mr. Joseph V. Willey, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022

RE:  New York City Health and Hospitals Corporation Improper Application of Weighted
Discharge Cap CIRP Groups
Provider Nos.: Various
Cost Reporting Periods Ended – Various

Dear Mr. Willey:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal
is enclosed. Please see enclosure for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
Final Decision Review and Appeal Information
Decision
42 USC 1395oo(f)
42 CFR 405.1875 and 405.1877

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

ON THE RECORD
2014-D28

**PROVIDER –**
New York City Health and Hospitals
Corporation Improper Application of
Weighted Discharge Cap CIRP Groups

Provider Nos.: See Appendix 1

**DATE OF HEARING –**
March 12, 2014

Cost Reporting Periods Ended –
See Appendix I

vs.

**INTERMEDIARY –**
National Government Services, Inc./
Blue Cross and Blue Shield Association

**CASE NOs.:** 08-1929GC; 09-0510GC;
11-0568GC

## INDEX

| | Page No. |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 9 |
| Stipulation of Facts | 10 |
| Providers' Contentions | 11 |
| Intermediary's Contentions | 15 |
| Findings of Fact, Conclusions of Law and Discussion | 15 |
| Decision and Order | 18 |
| Appendix I | 19 |

ISSUE:

Whether the Intermediary properly applied the weighted discharge cap to the Providers' ancillary costs.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a provider of medical services.

The Medicare program was established under Title XVIII of the Social Security Act ("Act") to provide health insurance to eligible individuals. Title XVIII of the Act was codified at 42 U.S.C. Chapter 7, Subchapter XVIII. The Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"), is the operating component of the Department of Health and Human Services ("DHHS") charged with administering the Medicare program. CMS' payment and audit functions under the Medicare program are contracted to organizations known as fiscal intermediaries ("FIs") and Medicare administrative contractors ("MACs")[1] determine payment amounts due the providers under Medicare law, regulation and interpretative guidelines published by CMS.[2]

Providers are required to submit cost reports annually, with reporting periods based on the provider's accounting period. A cost report shows the costs incurred during the relevant period and the portion of those costs allocated to the Medicare program.[3] Each intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement ("NPR").[4] A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board ("Board") within 180 days of the receipt of the NPR.[5]

The Medicare program reimburses participating health care providers for the reasonable cost of providing services to beneficiaries. The statutory provisions addressing Medicare reasonable cost reimbursement are located in 42 U.S.C. § 1395x(v)(1)(A)(2007) and state the following in pertinent part:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services. . . . . In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national

---

[1] FIs and MACs are hereinafter referred to as intermediaries.
[2] See 42 U.S.C. §§ 1395h, 1395kk-1; 42 C.F.R. §§ 413.20, 413.24.
[3] See 42 C.F.R. § 413.20.
[4] See 42 C.F.R. § 405.1803.
[5] See 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1835.

organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for the determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

Cost-reimbursed Medicare providers must be reimbursed the reasonable cost of covered services provided to Medicare beneficiaries. Costs cannot be shifted between Medicare and non-Medicare patients and payors. These statutorily-mandated requirements are reflected in the regulations at various parts. 42 C.F.R. § 413.5(2007) entitled "Cost reimbursement: General" states the following in pertinent part:

> (a) In formulating methods for making fair and equitable reimbursement for services rendered beneficiaries of the program, payment is to be made on the basis of current costs of the individual provider, rather than costs of a past period or a fixed negotiated rate. All necessary and proper expenses of an institution in the production of services, including normal standby costs, are recognized. Furthermore, the share of the total institutional cost that is borne by the program is related to the care furnished

beneficiaries so that no part of their cost would need to be borne by other patients. Conversely, costs attributable to other patients of the institution are not to be borne by the program. Thus, the application of this approach, with appropriate accounting support, will result in meeting actual costs of services to beneficiaries as such costs vary from institution to institution.

42 C.F.R. § 413.9(2007) entitled "Cost related to patient care" states the following in pertinent part:

> (a) *Principle*. All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in furnishing the services, subject to principles relating to specific items of revenue and cost. Thus, the application of this approach, with appropriate accounting support, will result in meeting actual costs of services to beneficiaries as such costs vary from institution to institution.
>
> (b) *Definitions*-(1) *Reasonable cost*. Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included. The regulations in this part take into account both direct and indirect costs of providers of services. The objective is that under the methods of determining costs, the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program. These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered services from both Medicare and the beneficiaries and the amount determined in accordance with an accepted method of cost apportionment to be the actual cost of services furnished to beneficiaries during the year.
> (2) *Necessary and proper costs*. Necessary and proper costs are costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities. They are usually costs that are common and accepted occurrences in the field of the provider's activity.
>
> (c) *Application*. (1) It is the intent of Medicare that payments to providers of services should be fair to the providers, to the contributors to the Medicare trust funds, and to other patients.

(2) The costs of providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care. The provision in Medicare for payment of reasonable cost of services is intended to meet the actual costs, however widely they may vary from one institution to another. This is subject to a limitation if a particular institution's costs are found to be substantially out of line with other institutions in the same area that are similar in size, scope of services, utilization, and other relevant factors.
(3) The determination of reasonable cost of services must be based on cost related to the care of Medicare beneficiaries. Reasonable cost includes all necessary and proper expenses incurred in furnishing services . . . . The reasonable cost basis of reimbursement contemplates that the providers of services would be reimbursed the actual costs of providing quality care however widely the actual costs may vary from provider to provider and from time to time for the same provider.[6]

42 C.F.R. § 413.50(2007) entitled "Apportionment of allowable costs" states the following in pertinent part:

(a) Consistent with prevailing practice in which third-party organizations pay for health care on a cost basis, reimbursement under the Medicare program involves a determination of --
(1) Each provider's allowable costs for producing services; and .
(2) The share of these costs which is to be borne by Medicare. The provider's costs are to be determined in accordance with the principles reviewed in the preceding discussion relating to allowable costs. The share to be borne by Medicare is to be determined in accordance with principles relating to apportionment of cost.

(b) In the study and consideration devoted to the method of apportioning costs, the objective has been to adopt methods for use under Medicare that would, to the extent reasonably possible, result in the program's share of a provider's total allowable cost being the same as the program's share of the provider's total services. This result is essential for carrying out the statutory directive that the program's payments to providers should be such that the costs of covered services for beneficiaries would not be passed on to non-beneficiaries, nor would the cost of services for non-beneficiaries be borne by the program.

(c) A basic factor bearing upon apportionment of costs is that Medicare beneficiaries are not a cross section of the total

---

[6] (Emphasis in original.)

population. Nor will they constitute a cross section of all patients receiving services from most of the providers that participate in the program. Available evidence shows that the use of services by persons age 65 and over differs significantly from other groups. Consequently, the objective sought in the determination of the Medicare share of a provider's total costs means that the methods used for apportionment must take into account the differences in the amount of services received by patients who are beneficiaries and other patients serviced by the provider.

(d) The method of cost reimbursement most widely used at the present time by third-party purchasers of inpatient hospital care apportions a provider's total costs among groups served on the basis of the relative number of days of care used. This method, commonly referred to as average-per-diem cost, does not take into account, variations in the amount of service which a day of care may represent and thereby assumes that the patients for whom payment is made on this basis are average in their use of service.

(e) In considering the average-per-diem method of apportioning cost for use under the program, the difficulty encountered is that the preponderance of presently available evidence strongly indicates that the over-age 65 patient is not typical from the standpoint of average-per-diem cost. On the average this patient stays in the hospital twice as long and therefore the ancillary services that he uses are averaged over the longer period of time, resulting in an average-per-diem cost for the aged alone, significantly below the average-per-diem for all patients.

(f) Moreover, the relative use of services by aged patients as compared to other patients differs significantly among institutions. Consequently, considerations of equity among institutions are involved as well as that of effectiveness of the apportionment method under the program in accomplishing the objective of paying each provider fully, but only for services to beneficiaries.

(g) A further consideration of long-range importance is that the relative use of services by aged and other patients can be expected to change, possibly to a significant extent in future years. The ability of apportionment methods used under the program to reflect such change is an element of flexibility which has been regarded as important in the formulation of the cost reimbursement principles.

This regulation was originally promulgated on November 22, 1966 by the Social Security Administration ("SSA") which was the agency then responsible for administering the Medicare

program.[7] Further, in promulgating this regulation, SSA exercised the responsibility that
Congress delegated to the Secretary, that of devising cost-apportionment procedures that would
ensure that the costs of treating Medicare patients would not be borne by non-Medicare patients
and that the cost of treating non-Medicare patients would not be borne by Medicare patients.

In April 1968, the Bureau of Health Insurance ("BHI"), which was the bureau within SSA that
was then responsible for administering the Medicare program, issued Intermediary Letter
No. 321 ("IL 321") entitled "Determining Cost of Service for Medicare Beneficiaries in
Hospitals with All-Inclusive or No-Charge Structure – Temporary Alternative Methods
Available for Medicare Cost Reporting Periods Ending Before January 1, 1969" which laid out
five alternative cost apportionment methods – Methods A through E. The dispute in these group
appeals centers around Method B which was promulgated as follows:

> ### B. Sliding Scale to Account for Differences Between Average Length of Stay for Medicare Patients and that for All Patients
>
> It is accepted that patients, generally, receive more ancillary
> services in the early stages of hospitalization and, therefore, higher
> costs are incurred in the early days of each patient stay. Studies
> show that the aged patient remains hospitalized over a longer
> period (almost twice as long as younger patients) but requires less
> ancillary services over the latter part of his hospital stay. This is
> also true for the all-inclusive or no-charge hospitals. Therefore, in
> the absence of statistical data, a hospital may use the sliding scale
> method to determine ancillary costs, with routine service costs
> determined as provided under the Combination method. When
> using the sliding scale method the hospital would:
> a. Allocate total allowable costs between routine and ancillary
> services through step-down cost finding or by using the estimated
> percentage basis.
> b. Determine the average length of stay of all patients.
> c. Determine the average length of stay for Medicare patients.
> d. Calculate the average per diem allowable ancillary costs for all
> patients.
> e. Determine the weighted average percentage of average per
> diem ancillary costs for Medicare patients in the following manner:
> > (1) Average length of stay for all patients times 100%.
> > (2) All stays in excess of average length of stay for all patients
> > times 75%.
> > (3) The total of (1) and (2) above will produce a total weighted
> > value for the average length of stay for Medicare patients. This
> > weighted value, when divided by the average length of stay for

---

[7] 42 C.F.R. § 413.50 was originally codified at 20 C.F.R. § 405.403 in 1966 and then recodified at 42 C.F.R.
§ 405.403 in 1977 before it was recodified to its present location in 1986. *See* 31 Fed. Reg. 14808, 14809-14810
(Nov. 22, 1966); 42 Fed. Reg. 52826 (Sept. 30, 1977); 51 Fed. Reg. 34790 (Sept. 30, 1986).

> Medicare patients produces the percentage to be applied to the
> average ancillary per diem cost.
> f.   The resultant percentages from "c" above would be applied to
> the average ancillary per diem for all patients times the number of
> Medicare beneficiary days.[8]

As initially announced Method B did not contain a cap that limits cost apportionment where the
average length of stay for Medicare inpatients is less than the average length of stay for all
inpatients. In October 1971, BHI added this 100 percent cap provision to Method B through the
issuance of Intermediary Letter No. 71-25 which states in pertinent part:

> The purpose of this supplement is to offer clarification of the
> formulae for determining Medicare reimbursement as set forth in
> IL 321 under Method B (Sliding Scale) . . . . Several situations
> have come to our attention which indicates the need for such
> clarification.

> Method B—Sliding Scale Method

> The Sliding Scale Method is used to arrive at a percentage of
> ancillary average per diem costs as a basis for Medicare
> reimbursement for ancillary services. This percentage can be less
> than, but cannot exceed, 100 percent of the average ancillary per
> diem cost. Where the average length of stay for Medicare
> inpatients is less than the average length of stay for all inpatients,
> the percentage that would be derived under the formula authorized
> by IL 321 would be 100 percent.[9]

In June 1976, ILs 321 and 71-25 were incorporated into the Provider Reimbursement Manual,
CMS Pub. No. 15-1 ("PRM 15-1") at § 2208.[10]  As a result, the Method B instructions are laid
out in PRM 15-1 § 2208.1(B) as follows:

> B. Sliding Scale – Method B.—In the absence of charges or statistical
> data, a hospital may use the sliding scale method to determine ancillary
> costs, with routine service costs determined on an average per diem cost
> basis. Total allowable costs should be allocated between routine and
> ancillary services through step-down cost finding, or by using the
> estimated percentage basis where permitted.

> When using the sliding scale method to determine Medicare ancillary
> costs, the hospital would:

> 1.  determine the average length of stay of all patients;

---

[8] (Emphasis in original and example omitted) (copy included at Provider Exhibit P-6 (Case No. 11-0568GC)).
[9] (Emphasis in original.)
[10] *See* PRM 15-1, Transmittal 155 (June 1976).

2.  determine the average length of stay for patients 65 years or older;

3.  calculate the average per diem allowable ancillary costs for all patients;

4.  determine the weighted average percentage of average per diem ancillary costs for Medicare patient in the following manner:

   a.  multiply the average length of stay for all patients by 100 percent to determine a weighted percentage;

   b.  the difference in the number of days between the average length of stay for patients 65 years or older and the average length of stay for all patients must be multiplied by 75 percent to determine a weighted percentage;

   c.  the total of a. and b. above will produce a total weighted value for the average length of stay for patients 65 years or older.

This weighted value must be divided by the average length of stay for patients 65 years or older to produce the percentage to be applied to the ancillary average per diem cost.

*This percentage can be less than, but cannot exceed, 100 percent of the average ancillary per diem cost. Where the length of stay for Medicare inpatients is less than the average length of stay for all inpatients, the percentage derived under this formula would be 100 percent.*[11]

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

This is a consolidated case involving three groups. Appendix I contains a listing of the providers by group ("Providers"). The Providers are all part of the New York City Health and Hospitals Corporation ("HHC") which operates a municipal hospital system in New York City. Each of the Providers had a fiscal year that ended June 30th and the fiscal years ("FYs") at issue cover 1999 through 2007. During the years in question, the Provider's designated intermediary was National Government Services, Inc. ("Intermediary").

The Providers are all-inclusive rate providers that do not have departmental charges that would allow the apportionment of costs based on charges. For purposes of cost apportionment, they apportion costs pursuant to the instructions for Method B under PRM 15-1 § 2208. This is accomplished by completing schedules that are not part of the Medicare cost report. Under Method B delineated in PRM 15-1 § 2208.1(B), inpatient ancillary costs are apportioned to Medicare using an average per diem cost adjusted by a weighted average, which is based on a comparison of the average length of stay ("ALOS") of Medicare patients to all patients which the Intermediary has called total weighted discharge value ("WDV"). The purpose of the WDV is to adjust the inpatient length of stay to be uniform across payor types to reduce the potential over-apportionment of inpatient ancillary cost to Medicare beneficiaries which can occur when using the per diem method because ancillary services are generally consumed more heavily at the

---

[11] (Italics added, underline in original, and example omitted) (copy included at Provider Exhibit P-3 (Case No. 11-0568GC)).

beginning of a stay and because Medicare beneficiaries usually have longer lengths of stay than other patients.[12]

Where the ALOS of stay of Medicare patients is shorter than the ALOS of all inpatients, the weighted average adjustment should prevent apportionment of too little ancillary costs to Medicare, because in such cases the Medicare patients are presumed to have a higher average per diem ancillary cost than all inpatients. In such cases, however, the Secretary limited the amount of Medicare reimbursement for the higher average per diem ancillary cost to that of the lower amount of all inpatients' average per diem ancillary cost. The Intermediary accordingly limited the amount of Medicare reimbursement for the Providers' psychiatric and/or rehabilitation units, where the ALOS for Medicare patients was shorter than the ALOS for all inpatients.[13]

The Intermediary issued NPRs for the Providers' cost reporting periods at issue wherein the Intermediary capped the weighted discharge value at 100 percent for each provider's psychiatric and rehabilitation units where the ALOS for Medicare patients was shorter than the ALOS for all inpatients. The Providers timely appealed the Intermediary's determinations to the Board.

The Providers were represented by Joseph V. Willey, Esq., of Katten Muchin Rosenman, LLP. The Intermediary was represented by Arthur E. Peabody, Jr., Esq. of the Blue Cross and Blue Shield Association.

## STIPULATION OF FACTS:

The Provider and the Intermediary stipulated to certain facts, including the following pertinent facts:

1. For the years at issue, the HHC hospitals at issue were subject to the Medicare prospective payment system ("PPS") for general inpatient acute care services.

2. Such hospitals may be eligible to receive reasonable cost reimbursement for certain other services, including psychiatric and rehabilitation services, and for ancillary services furnished to "Part B inpatients" who have exhausted or are not eligible for Part A benefits.

3. During the periods under appeal, most cost-based providers were generally required to apportion cost to program beneficiaries based on the ratio of covered beneficiary charges to total patient charges on a departmental basis. That charge-based departmental apportionment of cost cannot be used unless the providers have developed and used a detailed charge structure that enables them to record total and Program beneficiaries' charges by department. Where providers do not maintain departmental charges, the Secretary has specified a different approach to cost apportionment: Cost Apportionment Methods A through E, explained in Provider Reimbursement Manual ("PRM") § 2208.1.

---

[12] *See:* Intermediary's Final Position Paper at 3 (Case No. 11-0568GC).

[13] *See:* Providers' Final Position Paper at 3 (Case No. 11-0568GC).

4. The Secretary announced the alternative Methods A through E of cost apportionment for all-inclusive rate providers in Intermediary Letter No. 321 (Apr. 1968).

5. These Methods A through E are presented "in the order of their preference," and hospitals are obligated to use Method A if their data allows it, or Method B, then C, and so forth. Also, "Having used an alternative of higher preference, a hospital may not elect to use an alternative of lower preference in subsequent reporting periods." [Provider] Exhibit P-3, PRM 2208.1.

6. The Hospitals in this case are All-Inclusive Rate Providers that used Method B for the apportionment of cost at the Hospitals.

7. Intermediary Letter 321 provides that Method B reimbursement methodology relies on two premises: (1) that patients generally receive more ancillary services in the early stages of their hospitalization, and, therefore, higher costs are incurred in the early days of each patient stay; and (2) that aged patients remain hospitalized over longer periods but require less ancillary services over the latter part of the hospital stay. [Provider] Exhibit P-6 at p. 4.

8. Providers' reimbursement under Method B varies depending on the ratio of the Average Length Of Stay for Medicare beneficiaries to the ALOS of all inpatients:

> Where the ALOS for Medicare patients is longer than the ALOS for all inpatients, the program pays providers less than all-inpatient average per diem ancillary cost.
> Where the ALOS for Medicare patients is shorter than for all inpatients, the program under the original Method B would pay more than the all-inpatient average per diem ancillary cost.

9. Intermediary Letter No. 71-25 issued in 1971, later incorporated in PRM § 2208.1 and 2208.3, contains a "100 percent cap." The 100 percent cap limits Medicare reimbursement to the average per diem ancillary cost for all inpatients. . . .

12. The weighted discharge percentage was capped at 100 percent where the Hospitals' Medicare average length of stay was shorter than the average length of stay.[14]

## PROVIDERS' CONTENTIONS:

The Providers contend that the weighted discharge cap is unlawful and deprives the hospitals of reimbursement to which they are statutorily entitled. Where the ALOS of Medicare patients is shorter than the ALOS of all inpatients, the weighted percentage adjustment should work to apportion more ancillary costs to Medicare, because in such cases the methodology presumes that average per diem ancillary cost for Medicare patients is higher than for all inpatients. The Secretary, however, capped the weighted discharge percentage at 100 percent, thereby, limiting Medicare reimbursement to the amount of average per diem ancillary cost for all inpatients. The

---

[14] Stipulation of Facts (Jan. 17, 2014).

Providers argue that this plainly violates Medicare law and regulations and is arbitrary and capricious. The Providers further maintain that the cap is invalid because it was not promulgated in accordance with the rule making requirements of the Administrative Procedure Act ("APA").[15]

The Providers contend that the cap violates Medicare law, as previously held by the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit"). Specifically, the Providers argue that, in 1992, the Ninth Circuit invalidated the Secretary's 100 percent cap in *County of Los Angeles v. Sullivan* ("*L.A. County*").[16] Three all-inclusive-rate public hospitals had objected that the cap violated the reasonable cost reimbursement requirements of 42 U.S.C. §§ 1395f(b) and 1395x(v)(1)(A) and the prohibition against cost shifting in § 1395x(v)(1)(A). The Ninth Circuit reversed the lower court which had upheld the Board and held:

> Pursuant to the statute, the Secretary may neither restrict payment
> to the hospitals of the reasonable costs of ancillary services, nor
> shift these costs to non-Medicare patients or the providers
> themselves. Accordingly, because the 100% limitation
> unnecessarily restricts reimbursement for ancillary services
> provided to Medicare patients, we hold that it contravenes the
> statutory requirements that the Secretary reimburse the hospitals
> for their reasonable costs and not shift Medicare patients' costs to
> non-Medicare patients or the hospitals themselves.[17]

The Providers argue that precisely the same law and logic must apply in these group appeals. Application of the cap violates the "reasonable cost" and "cost-shifting" provisions of Medicare law.[18]

The Providers contend that the cap prevents the hospitals from receiving statutorily mandated reasonable cost reimbursement. The Providers' Medicare patients stayed in the psychiatric and rehab units on average for fewer days than the ALOS for all inpatients. Therefore, the 100 percent cap resulted in under-apportionment of inpatient ancillary costs to the program and in reimbursement of less than the Providers' reasonable cost as determined by Method B. Because the 100 percent cap results in reimbursement of less than the hospitals' reasonable cost, it violates the statute and is invalid.[19]

Conversely, the Providers argue that, as the 100 percent cap results in under-apportionment of inpatient ancillary cost to the Medicare program, it produces over-apportionment of such costs to other patients and payors and is contrary to the cost shifting prohibition of Medicare law. This result is contrary to the Secretary's own regulations regarding cost apportionment as spelled out at 42 C.F.R. § 413.5(a) and 42 C.F.R. § 413.50(b), both of which emphasize that the costs of

---

[15] 5 U.S.C. Ch. 5. *See* Providers' Final Position Paper at 7 (Case No. 11-0568GC).
[16] 969 F.2d 735 (9th Cir. 1992) (copy include as Provider Exhibit P-5 (Case No. 11-0568GC)).
[17] *Id.* at 741 (citations omitted).
[18] *See* Providers' Final Position Paper at 8 (Case No. 11-0568GC).
[19] *See id.* at 9.

covered services for beneficiaries would not be passed on to non-Medicare beneficiaries and vice versa. [20]

The Providers go on to contend that the cap conflicts with other controlling authority, specifically, the regulations that govern cost apportionment at 42 C.F.R. § 413.50(c) through (g). These regulations reject the use of unadjusted all-patient average per diem cost, noting that such method does not recognize and take into account the following:

- "differences in the amount of services received by patients who are [Medicare] beneficiaries and other patients" pursuant to § 413.50(c);
- "variations in the amount of services which a day of service may represent" pursuant to § 413.50(d); and
- "evidence strongly indicates that the over-age 65 patient is not typical from the standpoint of average per diem costs" and that "average per diem cost for the aged alone [is] significantly below the average per diem for all patients pursuant to § 413.50(e).

This regulation also reflects the Secretary's consideration of equity among providers in determining a specific provider's reasonable costs as demonstrated by the following excerpts:

- "the relative use of services by aged patients as compared to other patients differs significantly among institutions" pursuant to § 413.50(f); and
- "the relative use of services by aged and other patients can be expected to change to a significant extent in future years" pursuant to § 413.50(g).

The Providers argue that the 100 percent cap contravenes these regulations in that it results in reimbursement of average per diem costs for Medicare beneficiaries whose ALOS is shorter than the ALOS of all inpatients, even where Method B presumes that the average per diem ancillary cost for such beneficiaries is higher. [21]

The Providers argue that the 100 percent cap is also unlawful because it is arbitrary and capricious based on its assertion that: (1) the 100 percent cap violates law and regulation; and (2) the Secretary has failed to provide any explanation for the cap.[22] In particular, the Providers contend that, when the Secretary added the 100 percent cap provision by IL 71-25 to Method B in 1971, there was no indication that the agency had considered relevant factors (such as whether the cap produces either reasonable cost reimbursement or cost-shifting, and whether shorter Medicare ALOS equals higher Medicare average per diem costs). Additionally, the Provider argues that the 100 percent cap is also capriciously inconsistent with the premises underlying Method B, as reflected in the Secretary's IL No. 321: that patients generally receive more

---

[20] *See id.* at 10.

[21] *See id.* at 10-11.

[22] *See* 5 U.S.C. § 706(2)(A) (stating that an agency rule is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) (agency action should be set aside if the agency did not consider all relevant factors, or if the agency made a clear error of judgment); *Motor Vehicle Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency must "articulate a satisfactory explanation for its action").

ancillary services at the beginning of their hospital stays, that longer hospital stays result in lower per diem ancillary costs, and that shorter hospital stays result in higher per diem ancillary costs.[23]

The Providers argue that the 100 percent cap was promulgated in complete disregard of the APA-mandated procedures. The APA at 5 U.S.C. § 553(b) requires that "General notice of proposed rulemaking shall be published in the Federal Register." Agencies must also give the public an opportunity to comment per § 553(c). The Providers posit that the addition of the 100 percent cap to the Method B computation plainly is a substantive rule, and it was not lawfully promulgated under the APA. It was announced in IL 71-25, which ignored the APA notice and comment requirements. This addition substantively altered the Method B cost apportionment computation, and it deprived the hospitals of reimbursement to which they were previously entitled. Because the 100 percent cap is a substantive rule, but not promulgated in accordance with the APA, it is improper and cannot be enforced.[24]

The Providers contend, that contrary to the Intermediary's suggestion, there were no alternatives to Method B in this case. The Secretary promulgated alternative methods A through E, but providers do not have flexibility in choosing which method they will use. The Methods are presented "in the order of their preference," and hospitals are obligated to use Method A if their data allows it, then Method B, then C, and so forth. Also, "[h]aving used an alternative of higher preference, a hospital may not elect to use an alternative of lower preference in subsequent reporting periods." HHC's accounting and recordkeeping systems allowed its hospitals to use Method B; the less-preferable Methods C, D, or E were not an alternative. HHC's recordkeeping did not allow its hospitals to "take advantage" of Method A.[25]

The Providers' refute the Intermediary's argument that the hospitals have not shown why their Medicare ALOS was shorter or why their Medicare patients recovered faster from the same illnesses. The Providers contend that Method B does not require a provider to make a showing as to why lengths of stays are long or short. Indeed, an explanation for individual patient lengths of stay is irrelevant as a matter of law, and antithetical to this proxy-based methodology.[26]

Finally, the Providers' refute the Intermediary's argument that, since there is no mention of the 100 percent cap in the statute, the Secretary has the authority to implement the cap. The Intermediary notes that the statute is silent with regard to the 100 percent cap. The Providers argue that there has never been statutory authority in these circumstances for CMS to: (1) bar hospitals from receiving statutorily-mandated reasonable cost reimbursement; (2) violate the prohibition against cost-shifting; (3) cap per diem reimbursement whenever the ALOS for Medicare patients is shorter than the ALOS for all inpatients; or (4) act arbitrarily, without explanation, in violation of the APA. [27]

---

[23] *See* Providers' Final Position Paper at 12 (Case No. 11-0568GC).

[24] *See id.* at 13.

[25] *See id.* at 3-4.

[26] *See id.* at 4.

[27] *See id.* at 5.

## INTERMEDIARY'S CONTENTIONS:

The Intermediary contends that Congress has afforded the Secretary the authority and discretion to determine the reasonable cost of services and the items to be included in the category of reimbursable services. Further, the Intermediary argues that the Secretary does not have to address every conceivable question and/or situation in determining reasonable cost reimbursement. Given the complexities of the Medicare program's reimbursement scheme, it would be impossible for the Secretary to deal with the intricacies of every hospital's accounting systems and recordkeeping practices. [28]

The Intermediary argues that, in determining reasonable reimbursement, the Secretary's regulations require the design of flexible reimbursement methods. In developing five methods for reimbursing ancillary costs for all-inclusive rate providers, the Intermediary believes that the Secretary has shown flexibility and given providers options to choose a method within reason. The Providers here could have adopted a more sophisticated recordkeeping method so that they could have converted from Method B to Method A, but they did not. Alternatives to Method B were available and the fact that the Providers' did not update their recordkeeping methods to take advantage of a different reimbursement method is not the fault of the Secretary. [29]

The Intermediary contends that it has followed the instructions pursuant to PRM 15-1 § 2208.1 in determining the Providers' ancillary costs and may not set aside the 100 percent cap as it is bound by the PRM. Moreover, while the Providers have shown that their Medicare ALOS was shorter than non-Medicare patients they have not shown why they were shorter. The Intermediary argues that the Providers have not satisfactorily established the reason for their shorter Medicare ALOS or that their Medicare patients recovered faster from the same illnesses. Moreover, the Providers have not demonstrated that the provisions of PRM 15-1 § 2208.1(b) are unreasonable. [30]

Additionally, the Intermediary argues that a review of 42 U.S.C. § 1395x(v) reveals that, because there is no mention of the cap in the statute, the Secretary has the authority to implement the cap. The Intermediary believes that the adoption of the 100 percent cap was well within the Secretary's authority, is not arbitrary or capricious, and does not disregard the notice and comment requirements of the APA because of the discretion afforded her in determining reasonable costs. The Intermediary maintains that it properly applied the weighted discharge cap to the Providers' ancillary costs. [31]

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After considering the Medicare law, regulations, program instructions, the evidence presented and the Parties' contentions, the Board finds and concludes that it was improper for the Intermediary to apply the weighted discharge cap (*i.e.*, the 100 percent cap) to the Providers' ancillary costs.

---

[28] *See* Intermediary's Final Position Paper at 4 (Case No. 11-0568GC).

[29] *See id.* at 4-5.

[30] *See id.* at 5.

[31] *See id.* at 5-6.

Through its review and analysis, the Board concludes that the Methods A through E cost apportionment methodologies as initially announced in April 1968 were interpretive guidance to implement the cost apportionment principles in 42 C.F.R. § 413.50 as it relates to preventing cost shifting between Medicare and non-Medicare patients in determining cost of service for Medicare beneficiaries in hospitals with an all-inclusive or no-charge structure.[32] Methods B through E were designed to be temporary and never intended to be permanent.

The Board finds that the Parties agree on the fundamental assumptions underlying Method B cost apportionment. First, patients generally receive more ancillary services in the early stages of their hospitalization and, therefore, higher costs are incurred in the early days of each patient stay. Second, patients who are 65 and older remain hospitalized over longer periods but require less ancillary services over the latter part of the stay. Significantly, these assumptions are stated in IL 321 and are rooted in and derived from the following principles stated in 42 C.F.R. §§ 413.50(c) and (e):

- "A basic factor bearing on apportionment of costs is that Medicare beneficiaries are not a cross section of the total population. . . . Consequently, the objective sought in the determination of the Medicare share of a provider's total costs means that the methods used for apportionment must take into account the differences in the amount of services received by patients who are beneficiaries and other patients serviced by the provider."

- "On average, this patient [*i.e.*, the over-65 patient] stays in the hospital twice as long and therefore the ancillary services he uses are averaged over the longer period of time, resulting in an average per-diem cost for the aged alone, significantly below the average-per-diem for all patients."

---

[32] IL 321 was issued in April 1968 shortly after the regulation now located at 42 C.F.R. § 413.50 was promulgated on November 22, 1966. *See supra* note 7. It appears that IL 321 is based on the "extensive consultation" process the resulted in the issuance of that regulation (as well as other foundational reasonable cost reimbursement regulations). *See* 31 Fed. Reg. 7864 (June 2, 1966) (stating: "[I]n the development of the proposed principles of reimbursement there has been extensive consultation with representatives of the American Hospital Association and with many others . . . . There have been meetings also with hospital administrators and comptrollers, nationally recognized authorities in the field of health care costs, and many other interested individuals and organizations. The Health Insurance Benefits Advisory Council, a 16-member non-Federal body established for the purpose of providing advice in the formulation of regulations, has given prolonged attention to the subject of cost reimbursement, and these principles are based on their advice and have their support."). *See also Executive Proceedings Discussing Proposed Hospital Insurance Reimbursement Guidelines with Officials of the Department of Health, Education, and Welfare: Hearing Before the S. Comm. On Finance*, 89th Cong. 48, 51, 72 (1966) (testimony of Robert M. Ball, SSA Commissioner, that includes statements such as "[o]n average [the over 65 patient] stays in the general hospital more than twice as long and the ancillary services that he uses are averaged over the longer period of time, resulting in an average per diem cost, if we looked at the aged alone, significantly below the average per diem cost for all patients. On the other hand, in extended care facilities and psychiatric institutions and tuberculosis sanatoriums, which are long-term care institutions, medicare program patients will be covered only at the first and more active phases of their care and it is true their costs may exceed the average per diem level."; and "older people do cost somewhat more in the admitting process, in the X-ray and laboratory departments and whatever you put them through, and for nursing services") (excerpts included as Provider Exhibit P-7 (Case No. 11-0568GC)).

At the outset, the Board notes that the agency added the100 percent cap to the Method B cost apportionment methodology 3½ years after that methodology had been issued and the agency has never provided any explanation for the addition of the cap at that late date. In particular, it is unclear how the 100 percent cap is consistent with the following objective stated in § 413.50(b):

> In the study and consideration devoted to the method of
> apportioning costs, the objective has been to adopt methods for use
> under Medicare that would, to the extent reasonably possible,
> result in the program's share of a provider's total allowable cost
> being the same as the program's share of the provider's total
> services.

Without knowing the rationale for the cap, the Board cannot give it great weight and declines to do so as explained below.

The Board finds that the application of the 100 percent cap limitation in determining Medicare ancillary costs, where the Medicare ALOS is shorter than the ALOS for all inpatients, violates the principle of reasonable cost reimbursement for providing services to beneficiaries, and also violates the prohibition against cost-shifting between Medicare and non-Medicare patients. Imposition of the cap fails to reflect that some Medicare patients (Medicare ALOS shorter than all inpatient ALOS) incur higher than average per diem ancillary costs. In those cases, the cap prevents the hospitals from recouping all of the cost attributable to those Medicare patients. The necessary corollary to this result is that imposition of the cap forces non-Medicare patients, or the hospitals themselves, to bear costs attributable to Medicare patients.

The Board concludes that it would be improper to use an assumption when it would result in lower costs to the Medicare program, but reject its corollary when it results in higher costs to the Medicare program. If the assumption that ancillary costs are higher in the early part of all patients' stays is valid to lower Medicare program costs where Medicare patient stays are longer than average, then that same assumption also must apply to increase Medicare program costs where Medicare patient stays are shorter than the average length of stay for all inpatients.

The Board rejects the Intermediary's assertion that the Providers have the burden of proof to demonstrate why their Medicare ALOS was shorter than non-Medicare patients in order to have the 100 percent cap removed. The Intermediary has essentially asserted that the Providers should produce evidence of their actual costs for Medicare patients in comparison to non-Medicare patients. However, Method B and its underlying assumptions were developed to be used in situations where a provider's accounting system could not produce actual cost or charge data at the patient level. As a result, the Board finds that the Providers do not have the burden of proof to establish that the actual costs of their Medicare patients were higher than that for their non-Medicare patients in order to have the 100 percent cap removed and that the Providers properly relied on the assumptions stated in Method B.

Finally, the Board notes that its findings are consistent with the Ninth Circuit's decision in *L.A. County*.

Page 18                                  Case Nos: 08-1929GC, 09-0510GC, 11-0568GC

DECISION AND ORDER:

The Intermediary improperly applied the weighted discharge cap (the 100 percent cap) to the
Providers' ancillary costs. The Board remands these cases back to the Intermediary to recalculate
the Providers' ancillary costs without applying the 100 percent cap in those instances where the
Medicare average length of stay is shorter than the average length of stay of all inpatients.

BOARD MEMBERS PARTICIPATING:

Michael W. Harty
John Gary Bowers, C.P.A.
Clayton J. Nix, Esq.
L. Sue Andersen, Esq.

FOR THE BOARD:

Michael W. Harty
Chairman

DATE: SEP 2 4 2014

Case Nos: 08-1929GC, 09-0510GC, 11-0568GC

## APPENDIX I
### LIST OF PROVIDERS BY GROUP

Case No.: 08-1929GC
Group Name: NYCHHC 1999-2003, 2006 Improper Application of Weighted Discharge Cap
Group

|     | Provider No.      | Provider Name                              | FYE        |
| --- | ----------------- | ------------------------------------------ | ---------- |
| 1   | 33-0204           | Bellevue Hospital Center                   | 6/30/1999  |
| 2   | 33-2016 33-5063   | Coler Memorial Hospital                     | 6/30/1999  |
| 3   | 33-0128           | Elmhurst Hospital Center                    | 6/30/1999  |
| 4   | 33-2008 33-5092   | Goldwater Memorial Hospital                 | 6/30/1999  |
| 5   | 33-0240           | Harlem Hospital Center                      | 6/30/1999  |
| 6   | 33-0127           | Jacobi Medical Center                       | 6/30/1999  |
| 7   | 33-0202           | Kings County Hospital Center                | 6/30/1999  |
| 8   | 33-0199           | Metropolitan Hospital Center                | 6/30/1999  |
| 9   | 33-0204           | Bellevue Hospital Center                    | 6/30/2000  |
| 10  | 33-2016 33-5063   | Coler Memorial Hospital                     | 6/30/2000  |
| 11  | 33-0128           | Elmhurst Hospital Center                    | 6/30/2000  |
| 12  | 33-2008 33-5092   | Goldwater Memorial Hospital                 | 6/30/2000  |
| 13  | 33-0240           | Harlem Hospital Center                      | 6/30/2000  |
| 14  | 33-0127           | Jacobi Medical Center                       | 6/30/2000  |
| 15  | 33-0202           | Kings County Hospital Center                | 6/30/2000  |
| 16  | 33-0231           | Queens Hospital Center                      | 6/30/2000  |
| 17  | 33-0396           | Woodhull Medical and Mental Health Center   | 6/30/2000  |
| 18  | 33-2016 33-5063   | Coler Memorial Hospital                     | 6/30/2001  |
| 19  | 33-2008 33-5092   | Goldwater Memorial Hospital                 | 6/30/2001  |
| 20  | 33-2016 33-5063   | Coler Memorial Hospital                     | 6/30/2002  |
| 21  | 33-2008 33-5092   | Goldwater Memorial Hospital                 | 6//30/2002 |
| 22  | 33-2016 33-5063   | Coler Memorial Hospital                     | 6/30/2003  |
| 23  | 33-0128           | Elmhurst Hospital Center                    | 6/30/2003  |
| 24  | 33-2008 33-5092   | Goldwater Memorial Hospital                 | 6/30/2003  |

Case Nos: 08-1929GC, 09-0510GC, 11-0568GC

| 25 | 33-0240 | Harlem Hospital Center | 6/30/2003 |
|----|---------|------------------------|-----------|
| 26 | 33-0127 | Jacobi Medical Center | 6/30/2003 |
| 27 | 33-0080 | Lincoln Medical and Mental Health Center | 6/30/2003 |
| 28 | 33-0199 | Metropolitan Hospital Center | 6/30/2003 |
| 29 | 33-0231 | Queens Hospital Center | 6/30/2003 |
| 30 | 33-0204 | Bellevue Hospital Center | 6/30/2001 |
| 31 | 33-0128 | Elmhurst Hospital Center | 6/30/2001 |
| 32 | 33-0240 | Harlem Hospital Center | 6/30/2001 |
| 33 | 33-0127 | Jacobi Medical Center | 6/30/2001 |
| 34 | 33-0202 | Kings County Hospital Center | 6/30/2001 |
| 35 | 33-0199 | Metropolitan Hospital Center | 6/30/2001 |
| 36 | 33-0396 | Woodhull Medical and Mental Health Center | 6/30/2001 |
| 37 | 33-0204 | Bellevue Hospital Center | 6/30/2002 |
| 38 | 33-0128 | Elmhurst Hospital Center | 6/30/2002 |
| 39 | 33-0240 | Harlem Hospital Center | 6/30/2002 |
| 40 | 33-0127 | Jacobi Medical Center | 6/30/2002 |
| 41 | 33-0202 | Kings County Hospital Center | 6/30/2002 |
| 42 | 33-0199 | Metropolitan Hospital Center | 6/30/2002 |
| 43 | 33-0231 | Queens Hospital Center | 6/30/2002 |
| 44 | 33-0396 | Woodhull Medical and Mental Health Center | 6/30/2002 |
| 45 | 33-2016 33-5063 | Coler Memorial Hospital | 6/30/2006 |
| 46 | 33-2008 33-5092 | Goldwater Memorial Hospital | 6/30/2006 |
| 47 | 33-0240 | Harlem Hospital Center | 6/30/2006 |
| 48 | 33-0231 | Queens Hospital Center | 6/30/2006 |
| 49 | 33-0396 | Woodhull Medical and Mental Health Center | 6/30/2006 |

Case No.: 09-0510GC
Group Name: NYCHHC 2004 Improper Application of Weighted Discharge Cap CIRP Group

|   | Provider No. | Provider Name | FYE |
|---|--------------|---------------|-----|
| 1 | 33-2016 33-5063 | Coler Memorial Hospital | 6/30/2004 |
| 2 | 33-2008 33-5092 | Goldwater Memorial Hospital | 6/30/2004 |
| 3 | 33-0240 | Harlem Hospital Center | 6/30/2004 |
| 4 | 33-0127 | Jacobi Medical Center | 6/30/2004 |
| 5 | 33-0202 | Kings County Hospital Center | 6/30/2004 |

| | 33-0080 | Lincoln Medical and Mental Health Center | 6/30/2004 |
|---|---|---|---|
| 6 | 33-0080 | Lincoln Medical and Mental Health Center | 6/30/2004 |
| 7 | 33-0199 | Metropolitan Hospital Center | 6/30/2004 |
| 8 | 33-0385 | North Central Bronx Hospital | 6/30/2004 |
| 9 | 33-0231 | Queens Hospital Center | 6/30/2004 |

Case No.: 11-0568GC
Group Name: NYCHHC 2007 Improper Application of Weighted Discharge Cap

| | Provider No. | Provider Name | FYE |
|---|---|---|---|
| 1 | 33-2016<br>33-5063 | Coler Memorial Hospital | 6/30/2007 |
| 2 | 33-2008<br>33-5092 | Goldwater Memorial Hospital | 6/30/2007 |
| 3 | 33-0202 | Kings County Hospital Center | 6/30/2007 |
| 4 | 33-0231 | Queens Hospital Center | 6/30/2007 |

## Final Decision Review and Appeal Information

The Provider Reimbursement Review Board's (Board) decision
becomes final 60 days after the date of receipt by the provider
unless within that time the Administrator of HCFA notifies the
parties of an action taken under the provisions of 42 C.F.R.
§ 405.1875. If such action is taken, then the Administrator's
decision becomes final 60 days after receipt thereof by the
provider.

Providers are permitted to initiate two actions within specified
time limits. First, the provider (and/or the intermediary) may
request the Administrator to review a Board decision within 15
days of its receipt. (See § 405.1875(b)). Secondly, Section
1878(f) of the Social Security Act ("Act"), 42 U.S.C.
§ 1395oo(f), permits a provider to obtain judicial review of a
final decision of either the Board or the Administrator by filing
a civil action within 60 days of the date on which the provider
receives such decision. (See also 42 C.F.R. § 405.1877). For
your convenience, a copy of each of the above-referenced
authorities is enclosed.

Enclosures

§ 405.1875  Administrator's review.

(a) *General rule.* (1) Except for a review of a notice that the Administrator has decided to review a decision, Reasons for not being the Administrator, as his or her designee of the Board, including a decision of the Administrator, or under § 405.1867 about the Board's jurisdiction to grant a hearing, the Administrator may exercise this discretion on his or her own motion, in response to a request from a party to a Board hearing, or in response to a request from HCFA.

(b) *Request for review.* A Board decision may be reviewed by the Administrator on his or her own motion, written request with the Administrator within 15 days of the receipt of the Board decision.

(1) The Office of the Attorney Advisory will examine the Board's decision, the requests made by a party or HCFA and any submission made in accordance with the provisions of this section in order to assist the Administrator in deciding whether to exercise this review authority.

(2) *Criteria for deciding whether to review.* In deciding whether to review a Board decision, either on his or her own motion or in response to a request from a party to the Board hearing or from HCFA, the Administrator will normally consider whether the Board decision:

(i) Is inconsistent with the applicable laws, regulations or general HCFA Rulings, or raises a policy issue that may affect the general administration of the program;

(ii) Is based on an unwarranted factual determination;

(iii) Is based on an incorrect or questionable application of law, regulation or HCFA Ruling;

(c) *Decision to review.* (1) Whether or not a party or HCFA has requested review, the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board and, if so, will indicate the particular issues he or she will consider.

(d) *Written submissions.* (1) Within 15 days of receipt of a notice that the Administrator has decided to review a Board decision, a party or HCFA may submit to the Administrator, in writing:

(i) Proposed findings and conclusions;

(ii) Supporting views or exceptions to the Board decision;

(iii) Supporting reasons for the exceptions and proposed findings; and

(iv) A rebuttal of the other party's request for review or other submissions already filed with the Administrator.

(2) These submissions shall be limited to issues that the Administrator has decided to review and confined to the record of the Board hearing.

(3) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the Administrator consider additional evidence, and so, Reasons for not being submitted to the Board, and may include new, substantial evidence concerning—

(i) Issues presented to the Board; and

(ii) New issues that have arisen since the case was presented to the Board.

(4) A copy of this paragraph (d) made under this paragraph shall be sent to each other party and to HCFA, if HCFA has previously—

(i) Requested that the Administrator review a Board decision or filed a written submission in response to a party's request for review;

(ii) Submitted material after the Administrator has announced that he or she will review a Board decision.

(e) *Any party* communication prohibited. All communications from any of the parties or HCFA about a Board decision being reviewed by this Administrator must be in writing and must contain a certification that copies have been served on the parties and HCFA, as appropriate. The Administrator will not consider any communication that does not meet these requirements or is not submitted within the required time.

(3) Any decision other than to remand will be conducted so far—

(f) *The report of the Board,* so far as it relates to the decision sought to be reviewed; and

(ii) Any material submitted under paragraph (d) or (e) of this section;

and

(iii) Generally known facts that are not subject to reasonable dispute.

(g) The Administrator may rely upon prior decisions of the Board, the Administrator and the courts, and other applicable law, whether or not cited by the parties and HCFA.

(h) *Remand.* (1) remand to the Board by the Administrator vacates the Board's decision.

(2) The Administrator will direct the Board to take further action with respect to the developments of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board.

(3) The following actions are not acceptable on remand—

(i) Presentation of evidence outside the time of the Board hearing that was known or reasonably could have been known;

(ii) Presentation of a reviewable court decision that was either not available in the case that was outside the time of the Board hearing or was decided after the Board hearing;

(iii) Change of a notice that the Administrator decided to review;

(iv) Presentation of an alternative legal basis concerning an issue in dispute.

(4) The new decision will be the final notice and issue a new decision.

(5) The Administrator reverses, affirms, modifies, or again remands with the provisions of this section.

(i) *Effect of Administrator's decision.* (1) If the Administrator has modified the parties and HCFA that he or she has decided to review a Board decision, the Administrator's decision and the reversal, modify or remand the case.

(2) If a party communicates from any of the parties or HCFA about a Board decision, the Administrator will make this decision 60 days after the provider received notification of the Board's decision and will promptly mail a copy of that decision to each party and to HCFA.

(j) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the Administrator consider any written substantiation made under this paragraph shall be sent to each other party and to HCFA, if HCFA has previously—

(iii) Charge of a notice that the Administrator decided to review;

(iv) Presentation of an alternative legal basis concerning an issue in dispute.

(4) The new decision will be the final decision, and issue a new decision.

(5) The Administrator reverses, affirms, modifies or again remands with the provisions of this section.

(iii) Attempted relitigation of a right made before or at the Board hearing.

[48 FR 4673, Oct. 7, 1983]

# THE SOCIAL SECURITY ACT AS AMENDED - TITLE XVIII

## Section 1878(f)(1) Judicial Review

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

§ 405.1877  Judicial review.

(a) *General rule.* Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—

(1) A final decision by the Board; or

(2) Any reversal, affirmance, or modification by the Administrator.

The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b) *Administrator declines to review a Board decision.* If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c) *Administrator does not act after reviewing a Board decision.* If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under § 405.1875(g)(2).

(d) *Matters not subject to judicial review.* Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in section 1886(d)(7) of the Act and § 405.1804.

(e) *Group appeals.* Any action under this section by providers that are under common ownership or control (see § 413.17 of this chapter) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f) *Venue for appeals.* An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (§ 413.17 of this chapter), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g) *Service of process.* Process must be served as described under 45 CFR part 4.

[48 FR 39836, Sept. 1, 1983, as amended at 48 FR 45774, Oct. 7, 1983; 51 FR 34793, Sept. 30, 1986]

(a)   General rule

Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of--

(1)   A final decision by the Board; or

(2)   Any reversal, affirmance, or modification by the Administrator.
The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b)   Administrator declines to review a Board decision
If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c)   Administrator does not act after reviewing a Board decision
If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under Section 405.1875(g)(2).

(d)   Matters not subject to judicial review
Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in Section 1886(d)(7) of the Act and Section 405.1804.

(e)   Group appeals
Any action under this section by providers that are under common ownership or control (see Section 405.427) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f)   Venue for appeals
An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (Section 405.427), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g)   Service of process
Process must be served as described under 45 CFR Part 4.

(41 FR 52051, Nov. 26, 1976. Redesignated at 42 FR 52826, Sept. 30, 1977 amended at 48 FR 39836, Sept. 1, 1983; 48 FR 45774, Oct. 7, 1983)